**ENTRY ORDER**

2019 VT 5

SUPREME COURT DOCKET NO. 2018-390

JANUARY TERM, 2019

| | | |
|---|---|---|
| In re PRB No. 2018-087 | } | Original Jurisdiction |
| | } | |
| | } | Professional Responsibility Board |
| | } | |
| | } | PRB DOCKET NO. 2018-087 |

In the above-entitled cause, the Clerk will enter:

¶ 1.     Upon review of the hearing panel decision in this matter, the Court concludes as follows: The decision presents a well-reasoned discussion.  Accordingly, the Court orders review of the decision on its own motion, adopts the hearing panel decision in its entirety as a final order of this Court, waives briefing and oral argument, and orders that the decision be published in the Vermont Reports.

STATE OF VERMONT
PROFESSIONAL RESPONSIBILITY BOARD

In re PRB No. 2018-087

Hearing Panel No. 2
Joseph F. Cook, Esq., Chair
Greg Worden, Public Member

**CORRECTED Decision No. 220**

Disciplinary Counsel and Respondent initiated these proceedings by filing a proposed stipulation of facts along with jointly proposed conclusions of law.  *See* Administrative Order ("A.O.") 9, Rule 11(D)(1)(a) (parties may initiate formal disciplinary proceeding by filing proposed stipulation of facts "along with any proposed legal conclusions and recommended sanction which disciplinary counsel and respondent, either separately or jointly, would like the hearing panel to consider").  Along with the proposed stipulation, the parties submitted a request for a hearing to present additional factual material to the Panel.  On August 6, 2018, the Hearing

Panel issued a decision in which it accepted paragraphs 1 through 28, 30 through 37, 40, 41, and 44 of the proposed stipulation. The Panel rejected the other statements in the proposed stipulation of facts on the grounds that they consisted of conclusions of law relating to the applicability of aggravating and mitigating factors for purposes of determining an appropriate sanction – not statements of fact. The Panel granted the parties' joint request for a supplemental hearing. The final merits hearing was held on October 23, 2018.[1]

With the factual record now complete, the above matter is ripe for a decision on the merits of the issues presented. Based on the stipulated facts that have been accepted by the Panel and the additional evidence in the record, the Panel issues the following findings of fact, conclusions of law and order:

### FINDINGS OF FACT

1.      Respondent was admitted to practice April 3, 1984 and has been actively practicing in the same law firm his entire career.

2.      In 1990, Respondent became the majority owner and managing partner of his firm, located in Bennington, Vermont.

3.      As the managing partner, Respondent is responsible for all staffing needs of the firm.

4.      The majority of Respondent's law practice involves real estate transactions.

---

[1] On the afternoon of the day preceding the final merits hearing, a jury trial in which one of the members of the Hearing Panel was representing a party was unexpectedly adjourned before the end of the day and, as a result, the member was required to return to court on the morning of the scheduled hearing in this disciplinary proceeding to complete the jury trial, thereby rendering him unavailable for the scheduled merits hearing. Disciplinary Counsel and Respondent were immediately notified by the Hearing Panel Counsel of this unexpected scheduling conflict. Upon being notified, they requested that they be allowed to waive the quorum provision in A.O. 9, Rule 2(B) ("Three members shall constitute a quorum . . . .") and that the Panel proceed to conduct the hearing with the remaining two members of the Panel. In light of Respondent's stated desire to bring the proceeding to a timely conclusion, the fact that the merits hearing had been rescheduled once before due to a panel member's scheduling problem, and the fact that the parties had previously stipulated to all the facts pertinent to whether Respondent committed violations of the Rules and that their pre-hearing submissions did not indicate any evidentiary conflicts, the Panel agreed to proceed with the hearing. The remaining two members are in agreement on all issues and therefore have proceeded to issue this decision.

5. Respondent maintains an IOLTA account through the Bank of Bennington.

6. He uses his account primarily for residential real estate closings.

7. Over the course of his 34 years of practice, Respondent has transitioned from manual trust account management to software-based trust account management systems.

8. In mid-2014, Respondent's law firm was using Quicken accounting software and was in the process of upgrading to QuickBooks accounting software.

9. On September 8, 2014, a staff member who was managing much of the day-to-day bookkeeping for 14 years, including the trust accounting reconciliation, left the firm unexpectedly.

10. Shortly after the staff member departed, Respondent reviewed all of the bookkeeping records and found the trust account reconciliations were current and accurate, and decided to hire an outside accountant to finish the transition from Quicken to QuickBooks and restructure the organizational system. The transition to QuickBooks was delayed for a protracted period of time. The cause of the delay was a failure on the part of Respondent to secure sufficient resources to advance and complete the transition task in a timely manner.

11. As a result of the incomplete transition from Quicken to QuickBooks and an inability to hire a suitable replacement for the departed staff member, Respondent's law firm operated, for a protracted period of time, with an inadequate system for managing his IOLTA account. Respondent eventually hired a capable person to assist him with bookkeeping functions, but she left the firm sometime in 2016.

12. During the transition from Quicken to QuickBooks, Respondent performed rudimentary manual accounting in each individual client file on a hand-written sheet tracking funds received and disbursed.

13. Respondent personally handled all fund deposits and disbursements during this period of time.

3

14. Respondent kept individual paper balance sheets in each client's file and monitored the IOLTA account online.

15. Each individual file contained a manual list of deposit monies in, and checks written out, with wire confirmations and check copies attached.

16. Respondent maintained manual bank account deposit books with a carbon copy of deposit slips and would attach the bank deposit receipt when he returned from the bank.

17. At some point in 2016, Respondent began to be struggle with the volume of real estate transactions being handled by his firm. In December of 2016, Respondent's firm was handling several real estate closings every day. The required monthly reconciliation of Respondent's IOLTA account was not being performed at this time.

18. As of approximately December 2016, Respondent was six months behind in completing the requisite monthly reconciliations. Respondent was generally aware of his obligations under the Rules of Professional Conduct relative to managing client trust accounts (IOLTA), including the obligation to perform monthly reconciliation. He believed that he would catch up with the monthly reconciliations and otherwise come into compliance within a reasonable period of time and that, in the meantime, no client funds were in jeopardy.

19. During this period of time in 2016 and through the fall of 2017, there were numerous times when Respondent did not collect wire fees ranging from $10 to $20. When Respondent became aware of these omissions, he promptly covered them out of the firm's operating account.

20. The instances where Respondent failed to collect wire fees caused client accounts entered into QuickBooks by the firm's outside accountant to not reconcile with the client file hand-written sheet.

21. The memo line in checks that Respondent would write from the trust account also lacked clarity and uniformity, which caused confusion for the outside accountant and on occasion

4

caused transactions to be posted to the wrong client and created the incorrect appearance of negative balances for some clients and positive balance for others.

22. In June 2017, after nearly a year of searching and a few short-term hires that did not work out, Respondent finally located and hired a suitable replacement staff member whom he currently employs to assist him with his trust accounting obligations.

23. In December 2017, as part of a routine compliance audit, JMM & Associates' CPA Randall Sargent reviewed with Respondent his trust account records for the period of October 1, 2016 to November 30, 2017.

24. Sargent generated a two-page report, dated December 7, 2017, in which he opined that Respondent had not complied with the requirements of V.R.Pr.C. 1.15 and 1.15A during the period of time in question. In his report, he found that: (1) on the list of individual client balances maintained by Respondent there were balances which were not identified to specific clients, caused by deficient record keeping; (2) there were several instances of negative balances on the Respondent's list of client balances due to inadequate record-keeping, which raised questions as to whether Respondent might have been using one clients funds in connection with a different client matter; (3) Respondent did not have in place a system to record all receipts and disbursements for certain interest-bearing individual client trust accounts, caused by Respondent's practice of informally monitoring the activity within the accounts; (4) there was a lack of documentation showing timely notice to clients of activity within individual interest-bearing client trust accounts, caused by Respondent's practice of informally discussing with clients the activity within the accounts; and (5) in several instances, Respondent failed to complete reconciliation of the trust accounts to the bank statements, the ledger balance, and the list of funds held for each client.

25. Respondent has agreed that the findings in the Sargent report are accurate.

26. On March 30, 2018, Disciplinary Counsel and Respondent met at his office and reviewed the accounts that were the subject of CPA Sargent's report.

27. Respondent's new staff member assigned to work on Respondent's trust accounts and Respondent's accountant were present at the meeting on March 30, 2018.

28. As a result of the meeting, Disciplinary Counsel determined that each item of noncompliance identified in the Sargent report had been remedied.

29. At the meeting, Respondent was able to demonstrate his trust accounting system using QuickBooks.

30. As of March 30, 2018, Respondent had completed the backlog of sorting through clients' accounts so that the funds in and out the accounts now do match the manual sheets and the bank statements.

31. Trust account checks are now being printed directly from QuickBooks, with more detailed and uniform memo lines. Wire transfer fees now come out of a separate account to avoid confusion and are accounted for.

32. At the meeting, Respondent was able to produce an up-to-date record showing receipts, disbursements, and a running balance by individual client; a record showing receipts, disbursements, and running balance for the entire trust account; and bank statements.

33. The accounting system now shows the information needed to provide timely notice to clients of all receipts and disbursements from the trust account going forward.

34. The accounting system now shows the tools required for a timely three-way reconciliation, to be performed at the end of each month.

35. There is no evidence that any bookkeeper or attorney unlawfully took or used client funds. No complaint alleging any misuse by Respondent of client funds has ever been under investigation by the Office of Disciplinary Counsel.

6

36. There is no evidence that any client funds were ever lost as a result of the deficiencies in Respondent's trust accounting procedures.

37. Respondent has no prior disciplinary record.

38. Respondent lacked any dishonest or selfish motive.

39. Respondent cooperated fully in the disciplinary investigation undertaken by Disciplinary Counsel.

40. Respondent has a good reputation in his field of practice.

41. Respondent has worked to secure a more manageable workload and balance his caseload with his administrative responsibilities as managing partner of the law firm.

42. Respondent accepted full responsibility for his misconduct from the outset of the compliance audit. In addition, at the evidentiary hearing, he expressed his remorse for his misconduct and the Panel finds his testimony to be compelling.

## CONCLUSIONS OF LAW

Rule 1.15(a)(1) of the Vermont Rules of Professional Conduct provides as follows:

> A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in accordance with Rules 1.15A and B. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of six years after termination of the representation.

V.R.Pr.C. 1.15(a)(1).

Rule 1.15A provides, in pertinent part, as follows:

> (a) Every lawyer or law firm holding funds of clients or third persons in connection with a representation as defined in Rule 1.15(a)(2) shall hold such funds in one or more accounts in a financial institution or, in appropriate circumstances, a pooled interest-bearing trust account pursuant to Rule 1.15B. An account in which funds are held that are in the lawyer's possession as a result of a representation in a lawyer-client relationship or a fiduciary relationship shall be clearly identified as a "trust" account or shall be identified as a fiduciary account, such as an estate, trust, or escrow account, to distinguish such funds from the

7

lawyer's own funds. An account in which funds are held that are in the lawyer's possession as a result of a fiduciary relationship that arises in the course of a lawyer-client relationship or as a result of a court appointment shall be clearly identified as a "fiduciary" account. The lawyer shall take all steps necessary to inform the financial institution of the purpose and identity of all accounts maintained as required in this rule. The lawyer or law firm shall maintain an accounting system for all such accounts that shall include, at a minimum, the following features:

(1) a system showing all receipts and disbursements from the account or accounts with appropriate entries identifying the source of the receipts and the nature of the disbursements;

(2) a record for each client or person for whom property is held, which shall show all receipts and disbursements and carry a running account balance;

(3) records documenting timely notice to each client or person of all receipts and disbursements from the account or accounts; and

(4) records documenting timely reconciliation of all accounts maintained as

required by this rule and a single source for identification of all accounts maintained as required in this rule. "Timely reconciliation" means, at a minimum, monthly reconciliation of such accounts.

V.R.Pr.C. 1.15A(a).

During the period of time audited – October 1, 2016 to November 30, 2017 – Respondent's accounting system did not meet the requirements of Rule 1.15A(1)-(3). Respondent was relying on manual recordkeeping in individual client files to track receipts and disbursements from his IOLTA and other trust accounts. He lacked a coordinated accounting system. Respondent failed on several occasions to keep track of wire transfer fees charged by the bank, resulting in accounting errors. In addition, Respondent failed to identify the client adequately on several checks written from trust accounts, causing some transactions to be posted to the wrong client and resulting in incomplete and inaccurate accounting. Respondent also failed to provide timely notice to his clients of receipts and disbursements. And Respondent failed to perform the requisite monthly reconciliations of the bank statement, account register, and list of client balances.

8

It was incumbent upon Respondent to ensure that he was maintaining an adequate accounting system at all times and to undertake timely and complete reconciliations in order to identify any errors and correct them promptly. He failed to do so. His conduct violated Rule 1.15(A)(a).

## SANCTIONS DETERMINATION

The Vermont Rules of Professional Conduct "are 'intended to protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar.'" *In re PRB Docket No. 2006-167*, 2007 VT 50, ¶ 9, 181 Vt. 625, 925 A.2d 1026 (quoting *In re Berk*, 157 Vt. 524, 532, 602 A.2d 946, 950 (1991)). The purpose of sanctions is not "to punish attorneys, but rather to protect the public from harm and to maintain confidence in our legal institutions by deterring future misconduct." *In re Obregon*, 2016 VT 32, ¶ 19, 201 Vt. 463, 145 A.3d 226 (quoting *In re Hunter*, 167 Vt. 219, 226, 704 A.2d 1154, 1158 (1997)).

### Applicability of the ABA Standards for Imposing Lawyer Sanctions

Hearing panels are guided by the ABA Standards when determining appropriate sanctions for violation of the Vermont Rules of Professional Conduct:

> When sanctioning attorney misconduct, we have adopted the *ABA Standards for Imposing Lawyer Discipline* which requires us to weigh the duty violated, the attorney's mental state, the actual or potential injury caused by the misconduct, and the existence of aggravating or mitigating factors.

*In re Andres*, 2004 VT 71, ¶ 14, 177 Vt. 511, 857 A.2d 803.

"Depending on the importance of the duty violated, the level of the attorney's culpability, and the extent of the harm caused, the standards provide a presumptive sanction. *** This presumptive sanction can then be altered depending on the existence of aggravating or mitigating factors." *In re Fink*, 2011 VT 42, ¶ 35, 189 Vt. 470, 22 A.3d 461.

### The Duty Violated

The ABA Standards recognize a number of duties that are owed by a lawyer to his or her client. *See Standards for Imposing Lawyer Sanctions* (ABA 1986, amended 1992) (*"ABA*

*Standards"*), Theoretical Framework, at 5. Other duties are owed to the general public, the legal system, and the legal profession. *Id.* In this case, Respondent owed a duty to his clients to safeguard and preserve their property through adherence to the trust account rules. *See also id.* (providing that the "duty of loyalty" includes a duty to "preserve the property of a client.")

### Mental State

"The lawyer's mental state may be one of intent, knowledge, or negligence." *ABA Standards*, § 3.0, Commentary, at 27. For purposes of the sanctions inquiry, "[a lawyer's] mental state is [one] of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result." *Id.*, Theoretical Framework, at 6. The mental state of "knowledge" is present "when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct [but] without the conscious objective or purpose to accomplish a particular result." *Id.* The mental state of "negligence" is present "when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.*; *see also id.*, at 19 (definitions of "intent," "knowledge," and "negligence"). The Supreme Court has observed that "application of these definitions is fact-dependent" and that "[t]he line between negligent acts and acts with knowledge can be fine and difficult to discern . . . ." *In re Fink*, 2011 VT 42, ¶ 38.

The circumstances of this case present the following question – when an attorney is aware of his or her obligation to put in place and maintain a comprehensive accounting system for trust account purposes and to undertake monthly reconciliations and has failed to do so for an extended period of time should that conduct be considered "knowing" or "negligent"?[2] One might argue

---

[2] This question plays a central role in determining whether the presumptive sanction in this case should be suspension, *see ABA Standards* § 4.12 ("Suspension is generally appropriate when a lawyer *knows or should know* that he is dealing improperly with client property and causes injury or potential injury to a client.") (emphasis added), or a public reprimand, *see id.* § 4.13 ("Reprimand is generally appropriate when a lawyer is *negligent* in dealing with client property and causes injury or potential injury to a client.") (emphasis added).

that Respondent's awareness of his firm's failure to comply with the requirements of Rule 1.15A(a) over a multi-month period of time necessarily indicates a "knowing" violation of the rules. Nevertheless, although the length of the period of time when Respondent failed to comply with the requirements of Rule 1.15A is troubling, the Panel ultimately concludes on the current record that Respondent's state of mind is best described as negligent.

On one hand, the Supreme Court has in some cases concluded that when a violation is committed with awareness that an ethical rule is being violated, then that conduct should be considered "knowing." For example, in *In re Fink* the Court reasoned as follows in upholding a panel determination that a failure to put a contingent fee agreement in writing was a knowing violation:

> As to the written agreement, the panel found that respondent's failure to put the contingent fee in writing was done knowingly because he was aware of the nature and circumstances of his actions that formed the basis for the violation. In other words, *he knew that having a written agreement was a requirement of the rules and that he did not have one with complainant.* Respondent does not really dispute that he understood the general obligation to put a contingent fee agreement in writing.

*In re Fink*, 2011 VT 42, ¶ 39 (emphasis added).[3]

On the other hand, the case law addressing violations of trust account procedures suggests the need for a more complex factual inquiry. In one recent case, the Court adopted a hearing panel's decision finding that a respondent was negligent where he failed to reconcile the firm's IOLTA account over a nine-month period of time. *See In re PRB No. 2013-145*, 2017 VT 8, ¶ 1, 204 Vt. 612, 621, 165 A.3d 130, 140 (concluding that "Respondent acted negligently when he failed to set up his Quicken accounting system in accordance with the Rules of Professional Conduct. *** Respondent was negligent when he failed to perform timely reconciliations of the

---

[3] By contrast, the Court concluded that respondent was negligent in connection with a separate violation for charging an unreasonable fee because he "believed that he would contribute to a greater degree to complainant's case [and] was not consciously aware that he would do very little work for a large fee . . . ." *Id*. ¶ 40. In other words, respondent in that situation believed he would not run afoul of the rule.

IOLTA account. Respondent was also negligent when he failed to correct entry errors that led to an incorrect running balance . . . .”). The hearing panel did not elaborate on its conclusion regarding respondent's mental state. The findings of fact indicate that respondent had assigned a staff member to maintain the firm's IOLTA account and that after she suddenly quit her job respondent "discovered the IOLTA account had not been reconciled for six months" and that this caused him to hire an accountant to investigate the matter further. *Id*. at 613. The panel found that respondent "fell behind in reconciling the IOLTA account due, in part, to the sudden departure of the employee responsible for performing the account reconciliations." *See also id.* at 615.

Based on these findings, the respondent in *PRB No. 2013-145* was obviously aware of his obligation to undertake monthly reconciliation. Moreover, it is problematic to conclude that his state of mind was appropriately characterized as negligent – as opposed to knowing – based on the fact that he assigned a staff member to handle the IOLTA account and then failed to supervise the staff member. The Professional Responsibility Program's guidance document for trust account management that was in effect at the time clearly indicates otherwise:

> If you have an employee or other person maintain the trust account records, you should review his/her monthly reconciliations. This ensures that they are being prepared and that the client records are accurate. It also emphasizes the importance of maintaining these records accurately and on a timely basis. The fact that a bookkeeper or secretary in your office was maintaining the records will not excuse you from responsibility if they are not handled properly.

*Managing Client Trust Accounts – Rules, Regulations, and Tips* (revised 1/6/2010 & 10/14/2014), at 11. It cannot be that a lawyer should be rewarded for turning a blind eye to his or her obligations.

Rather, it appears that other factual circumstances were taken into consideration by the panel – the fact that the respondent did not use the trust account for personal matters, that client funds were not "improperly used or in jeopardy of loss," and that there was no evidence of the account ever having been overdrawn. 204 Vt. at 615. The decision is properly understood in this light.

Similar factual circumstances were also present in another hearing panel decision adopted by the Court where a lawyer's failure to perform reconciliation was held without elaboration to have been negligent. *See In re PRB Docket No. 2014-133*, 2015 VT 63, 199 Vt. 640, 643, 136 A.3d 564, 567 (finding, in part, that "Respondent did not reconcile his trust account to his monthly bank statement" and concluding that "Respondent was negligent in his failure to follow the trust accounting rules."). The panel in that case found that "[r]espondent's client funds were never improperly used or in jeopardy . . . ." *Id.* at 642.

These two decisions suggest that absent additional facts indicating improper use of trust account funds or a failure to heed information indicating a need to act promptly to safeguard a client's funds, a failure to engage in monthly reconciliation and maintain a fully operational trust accounting system should be considered negligent conduct – even if a respondent was aware of his obligations under the rules and failed to act for a protracted period of time.[4] Because these two decisions are specific to the types of violations presented here, they are the most relevant for the Panel to consider.[5]

---

[4] In another case involving violation of trust account rules, the Court concluded that an attorney had a negligent state of mind where the parties stipulated that a commingling violation arose from the attorney's mistaken belief that the particular procedure being utilized did not violate the rules. *See In re PRB Docket No. 2012-155*, 2015 VT 57, ¶¶ 5-7, 199 Vt. 143, 121 A.3d 675. Because the interpretation of the trust account rules is not at issue in the current case -- Respondent does not and could not reasonably dispute that the trust account requirements include an express obligation to conduct monthly reconciliation -- that case is distinguishable.

[5] One possible distinction between these cases and the current situation is that the version of Rule 1.15A(a) in effect at the time of the audits in the two reported cases did not contain an express obligation to conduct monthly reconciliation. The rule was amended, effective May 9, 2016, to expressly require monthly reconciliation in Rule 1.15A(a)(4). However, both decisions considered the failure to reconcile to be a violation of the rule nonetheless, perhaps because the guidance document issued by the Vermont Professional Responsibility Program that was in effect at the time included a monthly reconciliation requirement. *See Managing Client Trust Accounts – Rules, Regulations, and Tips* (revised 1/6/2010 & 10/14/2014) at 10 ("Once a month you will receive your bank statement. The account balance on the bank statement *must* be reconciled to the account balance shown in your check register. *** Differences between the bank statement balance and the checkbook balance *should be investigated immediately and corrected* either in your records or by the bank") (emphasis added); *see also id.* (providing for further reconciliation to a "list of clients" and associated balances for each). Thus, the it appears that the 2016 amendment of the rule simply restructured an existing regulatory obligation and therefore should not result in treating Respondent's post-amendment failure to perform monthly reconciliation as knowing misconduct.

Taking into account this case law and the totality of the factual circumstances in this case, the Panel concludes that Respondent's state of mind for purposes of determining the appropriate sanction was that of negligence. While Respondent was generally aware of his obligations under Rule 1.15A, including the obligation to conduct monthly reconciliations, he did not intend to put his clients' funds at risk. In addition, he was conscientious about recording receipts and disbursements in individual client files and retaining the related records, and at no point did he have reason to believe that any client funds were at risk. Although he did fail to record some wire transfer fees, he promptly covered any such expense from his own funds when those fees came to his attention and there were no reported overdrafts from any trust account during the time period in question. Finally, it is significant that Respondent believed he would catch up with the backlog of reconciliations in the foreseeable future.

The Panel concludes that Respondent had a good-faith belief that he was on the path to completing the transition to a new comprehensive accounting system and addressing the backlog of monthly reconciliations. Although his belief was erroneous – as evidenced by the protracted delay in securing a fully functioning accounting system for his trust accounts and in catching up with the reconciliation backlog – the Panel is convinced based on Respondent's testimony at the hearing that his belief was sincere at the time. In addition, although it does not absolve Respondent, the fact that he had once had a capable staff assistant and was struggling to hire a qualified person to replace that staff member tended to support this belief. In hindsight, as Respondent concedes, he should have contracted for additional outside accounting services to address his problems and bring his accounting system into compliance in a timely manner.[6]

---

[6] The Panel observes that when an attorney has been selected by the Professional Responsibility Program for a random trust account audit, the attorney is typically notified well in advance of the audit. The Panel can only wonder whether Respondent might have brought his accounting system into compliance and his reconciliations up to date, and potentially avoided this disciplinary proceeding, if upon receiving notification he had promptly retained additional accounting resources to complete these tasks in a more expeditious manner. *See Managing Client Trust Accounts*, at 12 ("Disciplinary Counsel reviews the [CPA's compliance] report and, depending on the circumstances, works with the attorney to make any necessary

14

Nevertheless, his belief at that time is what matters – not 20/20 hindsight. For these reasons, the Panel concludes that Respondent's state of mind should be considered to be that of negligence.

## Injury and Potential Injury

The ABA Standards consider "the actual or potential injury caused by the lawyer's misconduct." *ABA Standards*, § 3.0(c), at 26. The term "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury." *Id*., Definitions, at 9. The term "potential injury" refers to harm that is "reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." *Id*. Under the ABA Standards, "[t]he extent of the injury is defined by the type of duty violated and the extent of actual or potential harm." *Id*. at 6.

Here, there was no evidence of any actual injury to any client. There was no evidence that any client funds were ever lost as a result of the deficiencies in Respondent's trust accounting procedures. Nevertheless, to the extent that some accounting errors were initially incorrect and that reconciliations were not timely undertaken, there was some potential for injury to Respondent's clients.

## Presumptive Standard under the ABA Standards

ABA Standard 4.13 applies in this case. It provides that "[r]eprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client." *ABA Standards* § 4.13. As discussed above, Respondent was negligent. In addition, while there was no actual injury as a result of Respondent's trust account violations, there was some potential for injury. Thus, the presumptive standard calls for a public reprimand. *See,*

---

changes, recommends that the attorney face formal disciplinary charges or informs the attorney that the attorney's system complies with the Rules of Professional Conduct.").

15

*e.g., PRB No. 2013-145*, 2014 Vt. at 621-622 (applying Standard 4.13 as presumptive standard where respondent failed to reconcile trust account for 9 months).

**Aggravating and Mitigating Factors Analysis**

Next, the Panel considers any aggravating and mitigating factors and whether they call for increasing or reducing the presumptive sanction of public reprimand. Under the ABA Standards, aggravating standards are "any considerations, or factors that may justify an increase in the degree of discipline to be imposed." *ABA Standards*, § 9.21, at 50. Mitigating factors are "any considerations or factors that may justify a reduction in the degree of discipline to be imposed." *Id*. § 9.31, at 50-51. Following this analysis, the Panel must decide on the ultimate sanction that will be imposed in this proceeding.

**(a) Aggravating Factors**

Based on the stipulated facts presented, the following aggravating factors under the ABA Standards are present:

**§ 9.22(d) (multiple offenses)** – Respondent's conduct involved multiple violations of the monthly reconciliation requirement and other provisions of Rule 1.15A(a).

**§ 9.22(i) (substantial experience in the practice of law)** – Respondent had over thirty years of practice at the time of the violations.

**(b) Mitigating Factors**

Based on the stipulated facts and supplemental evidence presented, the following mitigating factors under the ABA Standards are present:

**§ 9.32(a) (absence of prior disciplinary record)** – Respondent has no record of any prior disciplinary action having been taken against him.

**§ 9.32(a) (absence of a dishonest or selfish motive)** – Respondent did not engage in any dishonest conduct, nor did he seek to advance his own interests.

16

**§ 9.32(e) (full and free disclosure to disciplinary board or cooperative attitude toward proceedings)** – Respondent was cooperative during the course of the disciplinary process. However, the Panel cannot assign much weight to this factor because Respondent has a duty under V.R.Pr.C. 8.1(b) to cooperate in connection with any disciplinary investigation. *See, e.g.*, *In re Richmond's Case*, 872 A.2d 1023, 1030 (N.H. 2005) ("[W]e do not ascribe significant weight to this factor because a lawyer has a professional duty to cooperate with the committee's investigation").

**§ 9.32(g) (character or reputation)** – Respondent has a good reputation in his field of practice. He is highly respected and trusted by his peers and banking institutions as one of the preeminent real estate professionals in his community

**§ 9.32(l) (remorse)** – Respondent expressed remorse for his misconduct in his testimony before the Panel. The Panel has found his testimony in that regard to be compelling and deserving of considerable weight.

### (c)  Weighing the Aggravating Mitigating Factors

The mitigating factors substantially outnumber and outweigh the aggravating factors and justify a reduction of the presumptive sanction. The Panel concludes that the appropriate sanction in this case is a private admonition.

*          *          *

Having in mind that "[i]n general, meaningful comparisons of attorney sanction cases are difficult as the behavior that leads to sanction varies so widely between cases," *In re Strouse*, 2011 VT 77, ¶ 43, 190 Vt. 170, 34 A.3d 329 (Dooley, J., dissenting), the Panel considers whether a private admonition is consistent with past disciplinary determinations. As discussed above, strikingly similar factual circumstances were presented in *PRB No. 2013-145*, 2017 VT 8. In that case, the panel concluded that the predominance of mitigating factors justified a reduction of the presumptive sanction from a public reprimand to a private admonition. In reaching this result, it

17

placed significant weight on the fact that there was no actual injury and that the respondent had retained an accountant to bring his accounting system into compliance. As the Panel has found, those same considerations are applicable here as well. *Cf. In re PRB Docket No. 2014-133*, 2015 VT 63 (parties jointly recommended private admonition where violations included failure to reconcile to monthly bank statements and panel noted numerous mitigating factors). In sum, the Panel concludes that a private admonition is the appropriate sanction.

*          *          *

Finally, Disciplinary Counsel has suggested that the Panel consider requiring, in addition to the sanction imposed, a follow-up audit of Respondent's trust accounts as a condition of probation. Respondent has indicated that he is willing to submit to a follow-up examination and to be responsible for that expense. *See* Stipulation of Facts, 4/26/18, ¶ 38. Pursuant to A.O. 9, Rule 8(A)(6), the Panel concludes that notwithstanding the evidence indicating that Respondent is currently in compliance with the requirements of Rule 1.15A(a), it is appropriate in light of the extensive nature of the past violations to impose a period of probation in conjunction with a requirement that a follow-up audit be conducted, at Respondent's expense, to monitor Respondent's compliance with his trust account obligations.

**ORDER**

Based on the Panel's findings of fact and conclusions of law, Respondent is hereby admonished for violation of Rules 1.15 and 1.15A(a)(1) through (4) of the Vermont Rules of Professional Conduct. It is further ORDERED that Respondent is hereby placed on probation pending: (a) the submission to Disciplinary Counsel of an audit of Respondent's trust accounts for the six-month period following the issuance of this Order, to be undertaken by an auditor chosen by Disciplinary Counsel and at Respondent's expense, in order to assess Respondent's compliance with Rules 1.15 and 1.15A; and (b) Disciplinary Counsel's submission of an affidavit, pursuant to A.O. 9, Rule 8(A)(6)(b), stating that probation is no longer necessary and summarizing the basis

18

for that conclusion. Upon submission of Disciplinary Counsel's affidavit, Respondent's probation shall be terminated.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

☒ Publish

_____
Marilyn S. Skoglund, Associate Justice

☐ Do Not Publish

_____
Beth Robinson, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Karen R. Carroll, Associate Justice

19